# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | **Crim. No. 08-116 (PJS/SRN)** |
| **Plaintiff,** | |
| v. | **REPORT & RECOMMENDATION** |
| **Greg Allen Pickar,** | |
| **Defendant.** | |

Michael A. Dees, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Jordan S. Kushner, 431 South 7th St., Suite 2446, Minneapolis, Minnesota 55415, for Defendant Greg Allen Pickar

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Statements (Doc. No. 25), Motion to Suppress Evidence from Search and Seizure (Doc. No. 26) and Motion to Suppress Witness Identifications (Doc. No. 27). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[1]

**I.     FACTUAL BACKGROUND**

Defendant is charged with one count of bank robbery, which occurred on March 20, 2008, at Citizens Bank in Lakeville, Minnesota. (Indictment, Doc. No. 8). Testifying at the criminal motions hearing were three members of the Lakeville Police Department: Officer Christopher Gartzke, Detective Bradley Paulson and Officer Russell Helmueller. The

---

[1] The Court has addressed Defendant's non-dispositive motions in a separate Order.

Government submitted two exhibits: Government Exhibit 1 is the search warrant and affidavit for the search of a pick-up truck driven by Defendant and Government Exhibit 2 is a CD containing interviews of bank robbery eyewitnesses and identifications of Defendant. Defendant submitted Defendant's Exhibit 1, a CD containing photographs taken at the show-up identification procedure.

### A. Officer Gartzke's Testimony

Officer Gartzke, a uniformed Lakeville police officer, testified that while on patrol in his marked squad car on March 20, 2008 at 1:44 p.m., he received a dispatch call. The call alerted him to a bank robbery at Citizens Bank in Lakeville, approximately two miles away, and noted that the suspect was a white male, approximately 5' 6", with a shaggy beard, glasses, wearing a Minnesota Vikings jacket who left the scene in a gold or tan Chevrolet 4 x 4 pick-up truck, bearing Minnesota license plate number NTX-517. The suspect was last observed turning onto a road near the freeway entrance to Interstate-35 ("I-35").

Officer Gartzke drove to that area and made a guess that the bank robbery suspect might have turned onto I-35, heading north. On the freeway, Officer Gartzke only sporadically operated his lights because he did not want to alert the suspect. Officer Gartzke continued on to I-35W in the direction of Minneapolis and eventually observed the suspect vehicle in the middle lane of the three-lane freeway. The officer pulled behind the suspect and when the suspect moved to the right lane and then onto the shoulder, Officer Gartzke followed and activated his lights.

Officer Gartzke observed one person in the pick-up and he instructed the driver to step out of the vehicle. He testified that the driver was a white male, between 5' 6"-5' 8", with a

scruffy beard, long, straggly hair and glasses, wearing a Minnesota Vikings jacket. He positively identified Defendant in court as the person whom he pulled over. At the scene, Officer Gartzke ordered Defendant to the ground and drew his gun as he approached, which he described as standard procedure when approaching a robbery suspect, and handcuffed Defendant. Other officers arrived at the scene.

Officer Gartzke also pat-searched Defendant and, based on his past experience, felt what he believed to be a roll of cash in Defendant's pocket. He did not remove the money or ask any questions of Defendant. After handcuffing Defendant, Officer Gartzke placed him in the back of his squad car.

Officer Gartzke transported Defendant back to Citizens Bank in Lakeville for a show-up identification procedure and estimated that approximately a half hour had elapsed from the time he received the dispatch call until the time he arrived at Citizens Bank. He parked approximately 20 feet from the bank. Officer Gartzke and a plainclothes Lakeville police officer brought Defendant out of the squad car and stood on either side of him. Defendant stated that his hands hurt and that he had trouble standing. Officer Gartzke repositioned the handcuffs and stood alongside Defendant, helping him stand up. Both police officers stood within a few feet of Defendant so that Defendant would not flee or escape. Witnesses to the bank robbery separately viewed Defendant from inside the bank during the show-up procedure. The police did not show the witnesses any other suspects.

### B.   Detective Bradley Paulson's Testimony

Lakeville Police Department Detective Bradley Paulson testified that on March 20, 2008, he also heard the dispatch about the bank robbery. Detective Paulson, in plainclothes, initially

headed northbound on I-35, but when he received word that the suspect vehicle had been stopped along I-35 in Burnsville, he went to that location. When Detective Paulson arrived, he observed Defendant standing near the side of the road in handcuffs. He made sure that the scene was secure and that there were no other occupants in the vehicle driven by Defendant. After determining that there were no other occupants, Detective Paulson spoke with Defendant in the back of Officer Gartzke's squad car. Detective Paulson did not read a <u>Miranda</u> warning to Defendant. Detective Paulson asked Defendant his name and if he knew why he had been stopped and Defendant answered that he knew he was in trouble. Detective Paulson also asked Defendant if there was cash in the pick-up truck and if that constituted "all the cash." According to the detective, because cash is critical evidence in a bank robbery, sometimes suspects attempt to discard it. Defendant stated that there was money in his pocket. Detective Paulson also asked if the pick-up belonged to Defendant or in whose name it was registered. Detective Paulson testified that this is a standard traffic stop question.

Detective Paulson testified that when he asked Defendant if he knew why he had been stopped, he knew that Defendant's answer could possibly be incriminating. According to Detective Paulson, when he asked Defendant if there was cash in the pick-up, he was referring to the cash stolen from the bank. Detective Paulson acknowledged that the answer to his question could be incriminating. As to the question about ownership of the pick-up truck, Detective Paulson knew that the vehicle was not registered to Defendant. Detective Paulson agreed that the answer to his question might be incriminating.

      **C.**    **Officer Russell Helmueller's Testimony**

Lakeville Police Officer Russell Helmueller also testified at the hearing. Officer

Helmueller stated that on March 20, 2008, he received a call about the bank robbery. He was not in uniform and was driving an unmarked car. Officer Helmueller arrived at Citizens Bank and noted that other officers had secured the bank and were interviewing potential witnesses. Officer Helmueller interviewed the bank teller who had dealt with the bank robber as well as an employee staffing the bank's front desk. Officer Helmueller interviewed the witnesses separately in a back room of the bank.

According to Officer Helmueller, the witnesses separately went outside the bank to the parking lot to see if they could identify Defendant. Officer Helmueller testified that Officer Gartzke stood alongside Defendant and another Lakeville police officer, Officer Bohlen, stood on the opposite side of Defendant, shining a flashlight directly into his eyes. According to Officer Helmueller, the flashlight was used in order to distort Defendant's vision so that witnesses would not feel threatened. Officer Helmueller testified that Defendant wore a Minnesota Vikings jacket and had a long, thick beard and "messy hair," and was approximately 30 feet from the bank windows. Officer Helmueller did not believe that persons standing inside the bank could tell if Defendant was handcuffed, but they could tell that his hands were behind his back.

Having seen the surveillance tape of the bank robbery, Officer Helmueller surmised that the bank robbery took less than one minute. Officer Helmueller did not know how much time each witness had to view the suspect before and during the bank robbery. During the show-up identification, each witness, including the bank teller, viewed Defendant separately and positively identified him as the bank robber. During the show-up, each witness looked at Defendant for a matter of seconds. According to Officer Helmueller, the law enforcement

officers gave the witnesses no information about the suspect or where he had been stopped.

Officer Helmueller guessed that the show-up identification procedure lasted a total of 5-10 minutes. He believed that approximately 35 minutes had elapsed from the time he received the dispatch about the robbery to the time that he showed witnesses the suspect.

Defendant argues the following: (1) statements obtained from his custodial interrogation must be suppressed; (2) the show-up identification process violated Defendant's due process rights, requiring the suppression of all eyewitness identification evidence; and (3) evidence obtained as a result of search and seizure should be suppressed.

The Government opposes Defendant's suppression motions, arguing that: (1) the evidence obtained should not be suppressed because Defendant had no expectation of privacy in a stolen vehicle, he was validly stopped and the search was executed pursuant to a valid search warrant; (2) Defendant's statements should not be suppressed pursuant to the public safety exception to the <u>Miranda</u> requirement; and (3) Defendant's due process rights were not violated during the show-up identification procedure because the procedure was not unduly suggestive and it was sufficiently reliable.

## II.     DISCUSSION

### A.     Probable Cause

Defendant argues that any searches and seizures were conducted without the requisite probable cause to believe that the locations searched contained incriminating evidence and that the initial stop of his vehicle was not supported by probable cause. He also argues that his detention and arrest were not supported by probable cause to believe that he had committed a crime, or that his person or vehicle contained evidence of a crime. Finally, he argues that the

search warrant was not supported by probable cause and that its execution violated other constitutional requirements.

Probable cause to obtain a warrantless arrest exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in themselves to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.  See Beck v. Ohio, 379 U.S. 89, 91 (1964); Brinegar v. United States, 338 U.S. 160, 175-76 (1949).  The personal observations of officers may establish probable cause.  Police observation may range from a single officer observing an isolated incident to elaborate surveillance by teams of investigators.  See Pennsylvania v. Labron, 518 U.S. 938, 939 (1996); McDonald v. United States, 335 U.S. 451, 454-55 (1948). Police may use their experience, special training and expertise to draw limited inferences of criminal activity from behavior that is not facially criminal.  Texas v. Brown, 460 U.S. 730, 742-43 (1983); United States v. Terriques, 319 F.3d 1051, 1056 (8th Cir. 2003).  A finding of probable cause may be based on the collective knowledge and information of all of the officers involved.  United States. v. O'Connell, 841 F.2d 1408, 1419 (8th Cir.), cert. denied, 487 U.S. 1210 (1988).

Here, Officer Gartzke had sufficient probable cause to stop and arrest Defendant, given the totality of the circumstances.   Officer Gartzke knew that a suspect had fled the scene of a bank robbery, driving a tan or gold 4 x 4 pick-up truck, with Minnesota license plate NTX-517, traveling near the entrance to I-35.  Officer Gartzke decided to travel northbound on I-35 and eventually came upon the suspect vehicle.  The license plates matched the description, the vehicle matched the description and the driver matched the physical description of the bank

7

robbery suspect. When Officer Gartzke attempted to pull into the lane directly behind the vehicle driven by Defendant, Defendant pulled onto the shoulder. When Officer Gartzke ordered Defendant from the vehicle, he further observed that Defendant matched the description of the bank robber. Officer Gartzke's personal observations, corroborating reasonably trustworthy information relayed by the dispatcher, were sufficient to warrant a belief by a reasonably prudent person that an offense had been committed by Defendant. Officer Gartzke's observations, experience, special training and expertise allowed him to draw "limited inferences of criminal activity from behavior that is not facially criminal," Texas v. Brown, 460 U.S. at 742-43, namely, that Defendant was the bank robbery suspect. Accordingly, sufficient probable cause supported Defendant's stop and arrest.

The Government questions Defendant's challenge to the search of the pick-up, given that the vehicle was stolen. The courts which have addressed the issue have held that a possessor of a stolen vehicle has no legitimate expectation of privacy in the vehicle and, therefore, has no standing to contest a warrantless search of that vehicle. United States v. Lanford, 838 F.2d 1351 (5th Cir.1988); United States v. Tropiano, 50 F.3d 157 (2nd Cir.1995); United States v. Hensel, 672 F.2d 578 (6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907 (1982); United States v. Hargrove, 647 F.2d 411 (4th Cir.1981). The Eighth Circuit has held in similar circumstances that a person lacking an ownership interest in a vehicle lacks standing to contest the search of the vehicle. United States v. Barragan, 379 F.3d 525 (8th Cir. 2004) (holding that a passenger who did not have an ownership interest in a vehicle stopped for traffic violations did not have standing to challenge the search thereof); United States v. Green, 275 F.3d 694 (8th Cir. 2001) (finding that a passenger who did not have an ownership interest in a car that was stopped at a

drug interdiction checkpoint did not have standing to challenge the search thereof); United States v. Payne, 119 F.3d 637 (8th Cir. 1997) (holding that defendant who did not assert ownership of the car had no legitimate expectation of privacy in the car, as required to have standing to challenge the search of the car). Here, Defendant was not the rightful owner of the vehicle and therefore lacks standing to contest its search.

Furthermore, the search was executed pursuant to a search warrant and Defendant's challenge to the warrant also fails. Even if the Defendant had standing to contest the search, the warrant was sufficient on its face. Only information contained within the four corners of an affidavit may be considered in determining the existence of probable cause within a search warrant. United States v. Etheridge, 165 F.3d 655, 659 (8th Cir. 1999). The affidavit must show that there is a fair probability that contraband or evidence of a crime will be found in a particular place. Id., citing Illinois v. Gates, 462 U.S. 213, 238 (1983) (holding that the test is whether the issuing magistrate had a substantial basis for concluding there was probable cause).

In evaluating a challenge to a search warrant, deference is accorded to the issuing magistrate, United States v. Fulgham, 143 F.3d 399, 400 (8th Cir. 1998), and even in cases where the existence or nonexistence of probable cause presents a close question, finding of probable cause by the judge who issued the search warrant provides a substantial factor in favor of upholding the validity of warrant. United States v. Christenson, 549 F.2d 53, 57 (8th Cir. 1977). In this case, the search warrant was for the gold or tan pick-up truck. The affiant, Officer Helmueller, described the bank robbery on March 20, 2008, noting the eyewitness descriptions of the suspect and his vehicle. (Govt. Ex. 1, Application.) The affidavit also describes how Defendant was apprehended and that his physical description and that of the vehicle match the

9

description given by eyewitnesses to the bank robbery.  (Id.)  The type of items sought in the warrant – including items tending to show evidence of robbery or theft, weapons or tools that could be used or implied as weapons, items identifying the person possessing the vehicle – were items that one would expect to find following a bank robbery and such items were seized during the search of the vehicle.  (Govt. Ex. 1, Receipt.)

Based on a common sense reading of the entire affidavit, the Court finds that it contained sufficient probable cause to support the issuance of the search warrant. "And, even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."  United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) (citing United States v. Leon, 468 U.S. 897, 923 (1984)).  There is absolutely no indication that the issuing judge, the Honorable Martha Simonett, abandoned her judicial role, that the affiant knew of the falsity or was reckless with regard to the truth of anything in his affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable.  See generally Leon, 468 U.S. at 923 (explaining when the good faith exception does not apply); see also United States v. Gibson, 928 F.2d 250, 253-54 (8th Cir. 1991) (finding that the Leon good faith exception applied on a showing of probable cause much less than that exhibited here).

Finally, the Court has no evidence before it upon which to question the proper execution of the warrant.  The Court therefore recommends that Defendant's motion to suppress evidence seized as a result of the search warrant be denied.

      **B.**      **Suppression of Statements**

Defendant moves to suppress statements made to Detective Paulson at the scene of the arrest. Defendant argues that he was improperly interrogated while in custody without having received Miranda warnings. In response to Detective Paulson's questions, Defendant identified himself, responded that he knew that he was in trouble, and that the money was in his pocket. The Government contends that the questions asked were routine, preliminary questions not constituting interrogation, and therefore, not requiring a Miranda warning. Moreover, the Government argues that Defendant's statements are admissible under the public safety exception to Miranda.

The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves. U.S. Const. amend. V. Miranda warnings must be given before any interrogation of a suspect in custody may take place. Miranda v. Arizona, 384 U.S. 436, 460-61 (1966). Before the government may introduce in its case-in-chief an incriminating statement made by a defendant, it must prove a voluntary, knowing and intelligent waiver of the accused's rights under the Fifth Amendment. Id. at 475.

"Routine booking" questions are not considered interrogation and therefore do not require Miranda warnings. Pennsylvania v. Muniz, 496 U.S. 582, 600-02 (1990); see United States v. Jones, 266 F.3d 804, 812 (8th Cir. 2001) (holding that request for routine identification information was not interrogation); but see, e.g., United States v. Scott, 270 F.3d 30, 44 (1st Cir. 2001) (questions about age and residence were interrogation not fitting routine booking exception because officer knew answers would likely produce inculpatory information), cert. denied, 535 U.S. 1007 (2002); United States v. Henley, 984 F.2d 1040, 1042-43 (9th Cir. 1993) (officer asking whether suspect owned vehicle was interrogation when officer had reason to

11

believe vehicle was involved in illegal activity).

There is no question here that Defendant was in custody at the time the statements were made. He was handcuffed and detained in the back of a squad car. At the motions hearing, Detective Paulson testified that when he questioned Defendant, it was his understanding that Defendant was under arrest and not free to go. Because asking a suspect his or her name is the type of routine booking question that does not constitute interrogation, Defendant's statement in response to the question about his name is admissible. Because Detective Paulson knew that Defendant was the bank robbery suspect (since the description matched the description he had heard on the dispatch) and that the vehicle was likely not Defendant's vehicle (Paulson knew that the license plates were not registered to Defendant), Paulson had reason to believe that Defendant might admit to the robbery, might have the proceeds of the robbery in the vehicle or on his person and that the vehicle might be stolen. Therefore, Paulson's question as to why Defendant had been stopped and the questions about the cash and the ownership of the vehicle were not routine booking questions. Instead, they were questions likely to elicit incriminating responses. Defendant stated that he knew he was in trouble, that the money was in his pocket and that the vehicle did not belong to him.

The Government argues, however, that the public safety exception to Miranda applies, and that the statements should be admissible under that exception. In New York v. Quarles, 467 U.S. 649, 655 (1984), the Supreme Court held that there is a public safety exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence. The exception applies when "police officers ask questions reasonably prompted by a concern for the public safety." Id. at 656. In Quarles, the defendant was seen entering a

12

supermarket carrying a gun and when apprehended by police, he was wearing an empty shoulder holster. Id. at 651-52. The officer confronting him asked him where the gun was, to which the defendant responded, "the gun is over there." Id. The Court held that in such a situation, if police are required to recite the Miranda warning before asking the whereabouts of a gun, suspects in Quarles' position might well be deterred from responding. The Court underscored the effect that such deterrence might pose to public safety:

> Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

Id. at 657.

Similarly, in United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008), the Eighth Circuit held that the public safety exception to Miranda applied to the post-arrest questioning of the defendant, who was asked if there was anything in his car that might hurt the officers, because they had already found a pistol. The defendant in Liddell stated that he knew the pistol was located in his car. These cases illustrate that the public safety exception usually applies where a suspect has stored or abandoned dangerous evidence that may pose a threat to officers or to the public. See, e.g., Quarles, 467 U.S. at 657; United States v. Luker, 395 F.3d 830, 833-34 (8th Cir. 2005), cert. denied, 546 U.S. 831 (2005); United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1999).

The Government argues that the public safety exception applies here, because the cash proceeds from the bank robbery might have been thrown out of the window onto the freeway,

creating a "dangerous situation." While such actions might have led to the loss of evidence, this is not the type of danger addressed by the Miranda exception in Quarles. The public safety danger posed by cash flying out of a stopped vehicle is remote. Most importantly, the purpose for the public safety exception to Miranda – that a statement offered by the suspect will cure the danger – does not apply here. Any statement offered by Defendant about the location of the cash would not have rectified the "dangerous situation," in the way that statements about the location of guns cured the dangerous situations in Quarles or Liddell. If cash was blowing around on the freeway, the officers would have seen it themselves and there would have been no need to ask Defendant about the location of the cash. In short, the Court concludes that the public safety exception to the Miranda warning is wholly inapplicable here and the Court recommends the suppression of Defendant's statements to the effect that he knew that he was in trouble, that the cash was in his pocket and that the vehicle was not his. However, the Court recommends that Defendant's statement in which he simply provided his name be admissible.

### C. Eyewitness Identification Procedure

Defendant moves to suppress the eyewitness identifications, arguing that the show-up identification procedure violated his due process rights. Defendant contends that the show-up procedure was extremely suggestive because he was wearing handcuffs and standing between two police officers in front of a marked squad car (Def.'s Ex. 1, photographs taken at show-up) and unreliable because the Government did not establish how long or how clearly each witness viewed the bank robber during the robbery.

The Due Process Clause of the Fifth Amendment prohibits identification testimony derived from impermissibly suggestive procedures that may lead to an irreparably mistaken

identification. See Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314 (1987). In Neil v. Biggers, 409 U.S. 188, 198 (1972), the Supreme Court stated that "[i]t is the likelihood of misidentification which violates a defendant's right to due process"; thus, the Court focused its inquiry on the reliability of the identification testimony. In Biggers, the Court held that a show-up identification of a rape suspect by a victim made seven months after the crime did not violate due process because it had several indicia of reliability, including the victim's refusal to identify other suspects in show-ups. Id. at 200-01. Accordingly, an identification derived from unnecessarily suggestive procedures need not be excluded if the totality of the circumstances indicates that the identification is reliable. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Courts employ a two-step analysis to determine the admissibility of identification testimony. First, the defendant must prove that the identification procedure was impermissibly suggestive. See Biggers, 409 U.S. at 198-99. Second, the court considers whether the testimony was nonetheless reliable using the five factors enumerated in Biggers: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the defendant prior to the identification; (4) the witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed between the crime and the confrontation. See Biggers, 409 U.S. at 199-200; Manson, 432 U.S. at 114-16; Clark v. Caspari, 274 F.3d 507, 511 (8th Cir. 2001). Courts also consider the strength of other evidence against the defendant when making a reliability determination. See United States v. Rogers, 73 F.3d 774, 778 (8th Cir. 1996) (holding identification reliable because at least two other witnesses identified defendant);

Kennaugh v. Miller, 289 F.3d 36, 48 (2nd Cir. 2002) (finding identification reliable because other evidence of guilt powerful and defense counsel able to challenge reliability of suggestive in-court identification on cross-examination), cert. denied, 537 U.S. 909 (2002).

As to whether an identification procedure is inherently suggestive, the Eighth Circuit held that a show-up identification procedure was improperly suggestive where the defendant was viewed by two eyewitnesses while handcuffed and surrounded by armed police officers with no other suspects present. Clark, 274 F.3d at 511. In Clark, which involved a liquor store robbery by two suspects witnessed by two people, the two witnesses were asked to identify several suspects that had been apprehended by the police. Id. at 511. When the witnesses arrived at the show-up, they saw only two suspects, who were handcuffed and surrounded by several police officers, one of whom was holding a shotgun. Id. "Under these circumstances, [the witnesses] may have felt obligated to positively identify [the defendants], so as not to disagree with the police, whose actions exhibited their belief that they had apprehended the correct suspects." Id. Although the Eighth Circuit expressed its concern about the identification procedures used in that case, the court nevertheless held that the identifications were admissible because they were reliable.

In United States v. Martinez, 462 F.3d 903, 910-912, cert. denied, 127 S.Ct. 1502 (2007), however, the Eighth Circuit held that a show-up identification was not inherently suggestive. In Martinez, a bank robbery suspect was placed on the sidewalk in front of the bank toward the windows, with his hands cuffed behind his back and police officers present. Although the court concluded that this show-up identification procedure was not unduly suggestive, it stated that even if it was, the bank teller's identification was reliable because there was not a "very

substantial likelihood of irreparable misidentification." Id. (internal citations omitted).

In Trevino v. Dahm, 2 F.3d 829 (8th Cir. 1993), the court held that the admission of eyewitness identifications did not violate the defendant's due process rights even assuming that the sight of the defendant being led to a police car in handcuffs by two law enforcement officials was impermissibly suggestive; the application of the Biggers factors satisfied the court's concerns as to reliability of identification.[2]

Both Clark and Martinez present facts similar to the instant case, although the Eighth Circuit held that the show-up procedure in one case was not unduly suggestive and in the other case that it was. In both cases, however, the court upheld the admission of the results of the show-up because the evidence was nonetheless reliable. Here, while Defendant was flanked by a police officer and was presented to the witnesses with his hands behind his back in handcuffs, "necessary incidents of on-the-scene identifications, such as the suspect [] being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." United States v. King, 148 F.3d 968, 970 (8th Cir. 1998). The facts here do not necessarily support the conclusion that the identification procedure was impermissibly suggestive. Even if the show-up procedure utilized by the Lakeville police was unduly suggestive, the Court must still consider whether the identifications were reliable.

Applying the five Biggers factors to the eyewitness identifications, the Court is satisfied that there is not a substantial likelihood of irreparable misidentification. First, each witness had

---

[2]The Eighth Circuit noted that the witnesses had ample opportunity to observe the defendant before, during, and after shooting, several witnesses had their attention fixed on defendant during this period, witnesses had high degree of certainty in regard to identifications, and the time period between the crime and subsequent confrontation was only about 20 minutes.

an opportunity to view the defendant at the time of the crime.  (Govt. Ex. 2, CD of witness interviews/identifications).  Although the robbery lasted only a short time, Heather Blackwell, the bank teller, viewed the bank robber face-to-face during the robbery, and witnesses Brent Bartsch and Sara Forrey were on either side of Ms. Blackwell's station.  (Id.)  Pam Comfort, an employee sitting at the front desk near the front door of the bank, also had face-to-face contact with the bank robber when he entered the bank.  (Id.)  Pamela Stoltenberg was an employee who was near Ms. Blackwell when she heard the bank robber demand money from a second drawer.  (Id.)

Second, as to the witnesses' degree of attention at the time, the witnesses who were aware that a robbery was taking place – including Ms. Blackwell and Ms. Forrey – would have likely had a high degree of attention.  Third, regarding the accuracy of the witnesses' description of the defendant prior to the identification, the witnesses gave consistent descriptions of the bank robber, notably that the suspect was male, wearing a Minnesota Vikings jacket and wearing a long beard.  Fourth, in terms of the witnesses' level of certainty in identifying Defendant during the show-up, all of the witnesses positively identified Defendant and none of them wavered in that identification.  Fifth, the length of time that had elapsed between the crime and the identification was approximately 45 minutes.  In Biggers, the Supreme Court upheld an identification procedure that occurred seven months after the crime.  409 U.S. 188.  Here, the Court is satisfied that the 45-minute period would not produce a substantial likelihood of misidentification.

Finally, the Court considers the strength of other evidence against the defendant when making a reliability determination.  See Rogers, 73 F.3d at 778.  Here, one of the eyewitnesses,

18

Ms. Forrey, locked the bank doors following the robbery and ran to a bank window. (See Govt. Ex. 2.) She observed a man who looked like the bank robber leave the parking lot in a tan or gold Chevrolet 4 x 4 pick-up truck and she called out the license plate number of the vehicle. Ms Forrey then ran to another window and stood on a chair in order to see the direction taken by the driver. (Id.) This information was relayed to the dispatcher, who in turn, broadcast the description and details to the Lakeville Police. Officer Gartzke heard the dispatch and took an educated guess that the suspect might attempt to enter I-35. He eventually found the suspect vehicle, driven by a man who matched the description given by the witnesses. In light of this independent evidence, the Court finds that the show-up identifications were reliable. Accordingly, the Court recommends that Defendant's motion to suppress the eyewitness identifications be denied.

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence from Search and Seizure (Doc. No. 26) be DENIED;

2. Defendant's Motion to Suppress Statements (Doc. No. 25) be DENIED in part, as to Defendant's statement of his name, and GRANTED in part, as to all other statements; and

3. Defendant's Motion to Suppress Witness Identifications (Doc. No. 27) be DENIED.

Dated: November 18, 2008

                                                  s/Susan Richard Nelson

                                                  SUSAN RICHARD NELSON
                                                  United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 3, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.