UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 08-CR-0116 (PJS/SRN)

Plaintiff,

v.                                                                              ORDER

GREG ALLEN PICKAR,

Defendant.

Michael A. Dees, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Jordan S. Kushner, LAW OFFICE OF JORDAN S. KUSHNER, for defendant.

This matter is before the Court on defendant Greg Allen Pickar's objection to the November 18, 2008 Report and Recommendation ("R&R") of Magistrate Judge Susan R. Nelson [Docket No. 59]. Judge Nelson recommends (1) denying Pickar's motion to suppress evidence resulting from a search and seizure, (2) granting in part and denying in part Pickar's motion to suppress certain statements he made in response to police questioning, and (3) denying Pickar's motion to suppress evidence that certain witnesses identified him as having committed the bank robbery with which he is charged.

The Court has reviewed de novo those portions of the R&R to which Pickar objects, as required by 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b)(3), and the Court agrees with Judge Nelson's recommendations. The Court also agrees almost entirely with Judge Nelson's careful and thorough R&R and adopts it in all respects but one. Specifically, the Court adopts the R&R with respect to the motion to suppress evidence resulting from a search and seizure and with

-1-

respect to the motion to suppress certain statements Pickar made in response to police questioning.  The Court writes separately, however, on the question of suppressing the witness identifications.  Although the Court agrees with Judge Nelson's conclusion that the identifications should not be suppressed, the Court's reasoning differs somewhat from Judge Nelson's.

## I.  BACKGROUND[1]

At about 1:45 p.m. on March 20, 2008, a man entered Citizens Bank in Lakeville, Minnesota, walked up to Heather Blackwell's teller station, placed his right-hand jacket pocket with his hand inside it on the counter, and said he wanted to make a large withdrawal.  He told Blackwell to give him all of the hundreds, fifties, twenties, and tens from her drawer.  After she had done so, he asked about her second drawer.  Blackwell said that her second drawer was empty, and the man then walked calmly out of the bank with the cash.

---

[1]The facts in this section come from the testimony given at the suppression hearing held by Judge Nelson on October 24, 2008 and the exhibits introduced at that hearing.  Government Exhibit 2 is a CD containing an audio recording of a 911 call and audio recordings of witness interviews, including recordings of what the witnesses said during a "show-up" procedure in which they looked through a bank window at Pickar and were asked whether they recognized him as the person who robbed the bank.  Quotations of those interviews in this Order reflect the Court's own transcription of the audio files on Government Exhibit 2.

Pickar objected to admission of the audio recordings at the suppression hearing, asserting that they were hearsay.  Suppr. Hrg. Tr. at 61 [Docket No. 67].  Judge Nelson properly overruled the objection.  The rules of evidence, except for rules about privilege, do not apply at suppression hearings.  Fed. R. Evid. 104(a); Fed. R. Evid. 1101(d); *see also United States v. Matlock*, 415 U.S. 164, 175 (1974) (with respect to "proceedings where the judge himself is considering the admissibility of evidence," holding that "certainly there should be no automatic rule against the reception of hearsay evidence in such proceedings").

At the time, the only legitimate customer in the bank was Brent Bartsch.  Bartsch entered the bank around the same time as the robber and then got some deposit slips from Sara Forrey, a teller stationed next to Blackwell.  Bartsch left the bank without realizing that it had been robbed.

Forrey, while helping Bartsch, overheard the robber asking Blackwell for money.  After the robber left, Forrey noticed that Blackwell was upset, so she hit the bank's silent alarm. Forrey then locked the bank's front doors and ran to the window to try to spot the robber.  A second employee, Pamela Comfort, went to a different window to keep a lookout.

While Forrey and Comfort watched out the windows, the tellers' supervisor, Pamela Stoltenberg, called 911.[2]  She described the robber as a white man in his late fifties, around five feet six or five feet seven inches tall, with a very bushy beard, wearing a Vikings jacket, sunglasses, and something like a scarf around his neck.  As Stoltenberg was on the line with the 911 operator, Forrey saw a truck leaving the parking lot being driven by a man who, because of his large beard, looked to her like the robber.  Forrey called out the plate number, and Stoltenberg told the 911 operator that the robber was driving away in a gold Chevy four-by-four pickup truck with license plate NTX517.

Officer Christopher Gartzke of the Lakeville Police Department was in a squad car about two miles from the bank when a dispatcher told him of the bank robbery.  Suppr. Hrg. Tr. at 8 [Docket No. 67].  Gartzke drove toward the bank and got on Interstate 35W heading north.  *Id.* at 9.  Gartzke's dispatcher described the truck, provided the license-plate number, and described

---

[2]A recording of the 911 call is Track 9 on Government Exhibit 2.  The call lasted about five minutes.

the robbery suspect as a white male, approximately five feet six, with a shaggy beard, sunglasses, and a Vikings jacket.  *Id.* at 8-9.

After driving about four miles, Gartzke saw a truck matching the description that he had been given (including the license-plate number).  *Id.* at 11.  Gartzke got behind the truck, and the truck pulled over onto the shoulder of the highway and stopped.  Gartzke activated his emergency lights and pulled up behind the truck.  *Id.* at 11-12.  Gartzke told the driver to get out and lie down.  *Id.* at 13.  A member of the Burnsville Police Department arrived, and while that officer covered Gartzke, he approached the driver and handcuffed him.  *Id.* at 14.

The driver, who matched the description of the bank robber provided to Gartzke, was defendant Greg Allen Pickar.  *Id.* at 13-14.  Gartzke patted Pickar down and felt what he believed was money in his pants pocket.  *Id.* at 15.  Gartzke did not, however, remove the money from Pickar's pocket.  Following the pat-down search, Gartzke placed Pickar in the back of his squad car.  *Id.*

About this time, Detective Bradley Paulson of the Lakeville Police Department arrived at the side of the highway where Gartzke had detained Pickar.  Paulson approached Gartzke's squad car and opened the door to talk to Pickar.  *Id.* at 35-36.  He asked Pickar his name, and Pickar identified himself.  Paulson then asked Pickar if he knew why he had been stopped.  *Id.* at 36.  Pickar replied that he knew he was in trouble.  *Id.* at 37.  Paulson also asked Pickar if there was any cash in the truck.  *Id.* at 36-37.  Pickar replied that the money was in his pocket, and Paulson confiscated the money.  *Id.* at 38.  Finally, Paulson asked Pickar whose truck he had been driving.  *Id.*  (The record does not reflect Pickar's answer to that question, but Pickar was, in fact, driving a stolen truck.)  Paulson knew that Pickar's answers to all but the first question (about his

name) could be incriminating, but for some reason Paulson did not advise Pickar of his constitutional rights.  *Id.* at 41-44.

A short time later, Gartzke drove Pickar to Citizens Bank for a "show-up" identification procedure in front of the witnesses.  Gartzke estimated that he arrived at the bank with Pickar about a half an hour after he first heard about the robbery over his radio.  *Id.* at 15-16.

While Pickar was being detained by the side of Interstate 35W, several police officers went directly to Citizens Bank to interview the five witnesses:  Bartsch (the customer), Blackwell (the teller who was robbed), Forrey (the teller who worked next to Blackwell and identified the truck), Stoltenberg (Forrey's and Blackwell's supervisor), and Comfort (the bank employee who, like Forrey, watched the robber drive away from the bank).  Detective Russell Helmueller of the Lakeville Police Department interviewed Blackwell and Comfort, Officer Jeremy Lerfald interviewed Bartsch and Forrey, and Sergeant William Gerl interviewed Stoltenberg.

After the interviews, each witness was brought to a window inside the bank for a show-up identification procedure.[3]  During the show-up, Pickar was standing in the parking lot outside the bank, roughly twenty to thirty feet from the building.  Pickar stood in front of a marked squad car with his hands behind his back in handcuffs.  Gartzke, in uniform, stood to Pickar's left and supported him with one hand as Pickar leaned against the car.  A plainclothes officer stood to Pickar's right and pointed a flashlight in Pickar's face to prevent him from seeing the witnesses inside the bank.  Because the show-up procedure took place in broad daylight in the mid-afternoon, the flashlight did not noticeably illuminate Pickar's face.

---

[3]File DSCN3854.JPG on Defense Exhibit 1 is a photograph that depicts Pickar during the show-up procedure as seen from inside the bank.  The description of the show-up in the text is based on this picture and the testimony given by police officers at the suppression hearing.

Helmueller conducted the show-up procedure with four witnesses (Bartsch, Blackwell, Comfort, and Stoltenberg), and Lerfald conducted the show-up with the fifth witness (Forrey).[4] The show-up procedures all took place at about the same time, between forty-five minutes and an hour after the robbery.  Each witness was shown Pickar separately.

All five witnesses identified Pickar as the bank robber, but they had differing opportunities to observe him during the robbery as well as differing levels of confidence in their identifications.  Because such details are relevant to the reliability of their identifications, the Court discusses each witness's interview and identification separately.

### A. Pamela Comfort[5]

Comfort's desk was at the front of the bank.  She was escorting two customers out of the front entrance when the robber entered, and she came face to face with him.  Comfort watched the robber while he was at Blackwell's station and felt that something was not right.  Comfort came around from her desk to watch him as he walked calmly out of the bank.

Comfort did not speak to the robber, but she saw him carrying cash in his left hand as he went out the door.  In her interview, she described him as medium sized, wearing a purple team-sport jacket with writing on the back, which she assumed was a Vikings jacket.  She said that he

---

[4]Helmueller testified at the suppression hearing that he asked witnesses to look at Pickar in the following order:  (1) Comfort, (2) Blackwell, (3) Stoltenberg, and (4) Bartsch.  Suppr. Hrg. Tr. at 54-58.  In his police report, Helmueller said that he showed Pickar to Blackwell first and then to Comfort.  *Id.* at 69-71.  Because the order in which the witnesses saw Pickar is irrelevant, the Court does not discuss it further.

[5]Comfort's interview and her statements during the show-up procedure are Track 7 of Government Exhibit 2.

wore a scarf and mirrored sunglasses and had a very straggly beard.  She saw the robber's pickup truck as it was turning out of the parking lot and could see that the robber was alone in the truck.

After interviewing Comfort, Helmueller conducted the show-up identification procedure with her.  According to the government's audio recording, the show-up procedure lasted sixteen seconds.  The exchange between Helmueller and Comfort was as follows:

> Q:    Do you want to come over here Pam?
>
> A:    Yes.
>
> Q:    Is that the gentleman?
>
> A:    Yup, the —
>
> Q:    Are you sure that that's the gentleman?
>
> A:    Yes, sir.
>
> Q:    All right.  Thank you.  And what's your name?
>
> A:    Pam Comfort.

Gov't Ex. 2 Track 7 at 7:40 – 7:56.

### B.  Heather Blackwell[6]

Blackwell was helping a drive-up customer when the robber walked up to her teller station and said that he wanted to make a large withdrawal.  He placed his jacket pocket, with his hand inside it, on the counter of her teller station.

Blackwell said that she would be with him as soon as she finished with her drive-up customer.  Because she thought that the robber looked suspicious, she tried to unobtrusively get the attention of Stoltenberg, her supervisor.  When Blackwell returned to her station, the robber

---

[6]On Government's Exhibit 2, Blackwell's statements during the show-up procedure are Track 4 and her interview is Track 5.

told her to give him all of the hundreds, fifties, twenties, and tens in her drawer.  She gave him the loose bills from her first drawer and he then asked about her second drawer.  She answered that the second drawer was empty, and the robber walked slowly out of the bank.  Blackwell estimated that the encounter took a minute to a minute and a half.

In her interview, Blackwell described the robber as a white man, about five feet seven inches tall, with a grey beard and mustache, wearing multicolor-tinted sunglasses and a Vikings jacket.  She could not recall whether he was wearing a hat or anything about his shoes or pants. She did recall that he was not wearing a glove on his left hand (his right hand was in his jacket pocket the entire time, and she believed he might have had a gun).  Although she was not able to see his eyes, she thought that she would be able to recognize him "from his facial hair and stuff." Gov't Ex. 2 Track 5 at 8:08 – 8:16.

After interviewing Blackwell, Helmueller conducted the show-up identification procedure with her.  According to the government's audio recording, the show-up procedure lasted about thirty-six seconds.  The exchange between Helmueller and Blackwell was as follows:

> Q:     Now with Heather again.  He can't see you here.  Do you
>        recognize that person?
>
> A:     Yeah.
>
> Q:     Who is that person?
>
> A:     That is the person who walked up to my station and robbed
>        me.
>
> Q:     Okay —
>
> A:     Most definitely.
>
> Q:     — are you positive?

A:      Yeah.  I mean he had sunglasses on and he must have had a hat on 'cause I don't remember his hair looking like it was that long, but that's —

Q:      Are you surely positive that that is him?

A:      Yes.

Gov't Ex. 2 Track 4.

### C.  Pamela Stoltenberg[7]

Stoltenberg happened to see the robber through a bank window as he was walking from a nearby parking lot toward the bank.  She did not see him come into the bank and did not become aware of him again until she heard him asking Blackwell for the money in her second cash drawer.  At the time, Stoltenberg had her back to the teller counter and was picking up a printout from a printer behind Blackwell's station.

When she heard the robber demanding the cash from Blackwell's second drawer, Stoltenberg turned around, and the robber was walking away.  Stoltenberg was focused on Blackwell, not on the robber.  From the "quick glance" that she got of the robber, she described him as fifty to fifty-five years old, about five feet seven inches tall, with a "big huge bushy, bushy beard" and a "weathered" face.  Gov't Ex. 2 Track 6 at 2:12 – 2:46.  She also noticed that he was wearing a Vikings jacket and something like a red or orange scarf around his neck.  *Id.* Stoltenberg had not previously seen the robber in the bank.

According to the government's audio recording, the show-up procedure lasted about forty seconds.  The exchange between Helmueller and Stoltenberg was as follows:

---

[7]On Government's Exhibit 2, Stoltenberg's statements during the show-up procedure are Track 8 and her interview is Track 6.

Q:      Can you step up to the window?  Do you recognize any of
        the people out there as being involved in this?

A:      Yes, that's him.

Q:      Who — which one?

A:      The one in the Vikings coat.  The black jeans, long hair,
        beard.

Q:      Is he the same person that you saw in the bank here?

A:      Yes.

Q:      Okay.  Are you sure that that is the person?

A:      Yes.

Q:      Okay.

A:      I mean, I guess I, I — that's the person that looked — when
        I turned around and saw the person he is the one that I saw
        —

Q:      Okay.  That is the person?

A:      — he looks like the person that I saw, yes.

Q:      All right, okay.  And are you sure that that is the person?

A:      Yes.

Q:      All right.  Excellent.

Gov't Ex. 2 Track 8, 0:05 – 0:44.

### D.  Brent Bartsch[8]

Bartsch was the only legitimate customer in the bank when it was robbed.  At the time, he

was getting deposit slips from Forrey at the teller station next to Blackwell's.  Bartsch did not

------

[8]On Government's Exhibit 2, Bartsch's statements during the show-up procedure are
Track 2 and his interview is Track 1.

realize that a robbery was taking place and did not overhear the conversation between Blackwell

and the robber.  During his interview, Bartch said, "Preoccupied, I didn't think anything was

weird but hindsight, yeah, there was something weird going on."  Gov't Ex. 2 Track 1 at 1:19 –

1:24.  Bartsch and his interviewer, Lerfald, had the following exchange about the robber's

description:

> Q:    Can you describe what he looked like at all?
>
> A:    I just got the general impression he was kind of scraggly for being in the bank at this point in time, but I don't always dress the best myself so I didn't think much of it.
>
> Q:    Okay.  Did you see him, did you get a good look at what he was wearing, what he looked like, anything like that?
>
> A:    Well, he had that Vikings jacket on I believe.
>
> Q:    Okay.
>
> A:    And just the long hair and scruffy looking is my general impression.

*Id.* at 1:49 – 2:14.

Although Lerfald interviewed Bartsch, Helmueller conducted the show-up procedure with

Bartsch.  According to the government's audio recording, the show-up procedure lasted about

twenty-five seconds.  After Bartsch identified himself, Helmueller and Bartsch had the following

exchange:

> Q:    Can you step up to the window.  You're a customer here?
>
> A:    Yeah.
>
> Q:    Okay.  Do you recognize anybody standing out there?
>
> A:    That was him.
>
> Q:    Which, which guy?

A:     The guy with the long hair and the sweats, the ratty boots,
       the beard — I can't see the beard right now, 'cause —.

Q:     The Vikings jacket?

A:     Yeah.

Q:     Okay.  Are you positively sure that that is the person that
       was in here?

A:     Yeah.

Q:     All right.  Excellent.

Gov't Ex. 2 Track 2 at 0:05 – 0:30.

### E.  Sara Forrey[9]

Sara Forrey was helping Bartsch at the teller station next to Blackwell's when she saw the robber walk up to Blackwell's station.  Forrey heard the robber ask Blackwell for her hundreds, fifties, twenties, and tens, and for the cash from her other drawer.  In her interview, Forrey described the robber as wearing a starter jacket (i.e., a jacket with the logo of, and in the colors of, a professional sports team), a dark scarf, a hat, and iridescent sunglasses.  She also noticed a lot of facial hair — she could see his chops and his full mustache, but the scarf covered his beard.  She said that he had brown hair with a few gray straggles and guessed that he was in his late fifties.  As the robber walked away, Forrey saw him wearing what she thought were grey sweatpants and tennis shoes.

After the robber walked out and the employees realized that they had been robbed, Forrey ran to the windows to try to see him drive away.  She told her interviewer, Lerfald, that after a few minutes, "I saw this silver truck with a guy with a huge beard, um, I — I just assumed it was

---

[9]Forrey's interview and her statements during the show-up procedure are Track 3 of Government Exhibit 2.

him, um, just because of the beard, you know, the facial hair up here, um, so —"  Gov't Ex. 2

Track 3 at 5:59 – 6:14.  She yelled out the truck's license plate number and description, which

Stoltenberg passed along to the 911 operator.

Lerfald conducted the show-up procedure with Forrey.  According to the government's

audio recording, the show-up procedure lasted about thirty seconds.  The exchange between

Lerfald and Forrey was as follows:

> Q:    Come up her for me, Sara.
>
> A:    Okay.
>
> Q:    Can you see him okay?
>
> A:    Yup.
>
> Q:    Okay.
>
> A:    Yeah.
>
> Q:    Is that the person that was in here—
>
> A:    That is him.
>
> Q:    — and did the robbery?
>
> A:    Yeah.
>
> Q:    Are you a hundred percent sure?
>
> A:    Yes.
>
> Q:    Anything different about him?  Does he still have the same clothes on and everything?
>
> A:    He doesn't have his hat on, but that's the same jacket and sweatpants that I saw.
>
> Q:    Okay.  And we're standing in the lobby of the bank, is that correct?
>
> A:    Yes.

Q:     And he's outside of the bank?

A:     Yes.

Gov't Ex. 2 Track 3 at 8:39 – 9:08.

## II.  DISCUSSION

Pickar moves to suppress evidence that Bartsch, Blackwell, Comfort, Forrey, and Stoltenberg identified him as the man who had robbed the bank.  Describing the standards that govern a motion to suppress an out-of-court identification is somewhat challenging because of inconsistencies between the case law of the United States Supreme Court and the case law of the Eighth Circuit.

In *Neil v. Biggers*, the United States Supreme Court held, with respect to admitting evidence at trial of an *out*-of-court identification, "[i]t is the likelihood of misidentification which violates a defendant's right to due process . . . ."  409 U.S. 188, 198 (1972).  By contrast, with respect to admitting evidence of an *in*-court identification, "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification."  *Id.* (quotation omitted; emphasis added).  *Biggers* expressly said that although the "irreparable misidentification" standard applies to in-court identifications, it does not apply directly to evidence of out-of-court identifications.  Rather, the Supreme Court said of the in-court standard:  "[W]ith the *deletion* of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself."  *Id.* (emphasis added).

This distinction between in-court identifications and out-of-court identifications is logical.  In referring to the reparability of in-court misidentifications, the Supreme Court was referring to the tools available to judges and attorneys when a witness makes an error in the

courtroom — tools such as cross-examination and corrective jury instructions.  When a witness makes a mistake while testifying in court, the judge and the attorneys can quickly follow up with the witness and repair the problem, while the witness is still on the stand, and while the jury is still in the courtroom.  Of course, these tools are not available when a witness (who may or may not be available to testify at trial) misidentifies a suspect outside of court months or even years before trial.

As noted, *Biggers* clearly directed that the "irreparable misidentification" standard that applies to in-court identifications should not be applied to evidence of out-of-court identifications.  But in *Brodnicki v. City of Omaha*, the Eighth Circuit did what the Supreme Court said not to do — i.e., the Eighth Circuit held that introduction of evidence of an out-of-court identification does not violate a defendant's constitutional rights unless there is a "very substantial likelihood of irreparable misidentification."  75 F.3d 1261, 1265 (8th Cir. 1996).

*Brodnicki* did not discuss, distinguish, or even cite *Biggers* to support applying the "irreparable misidentification" standard to out-of-court identifications.  Rather, *Brodnicki* cited a post-*Biggers* Eighth Circuit case, *United States v. Henderson*, 719 F.2d 934, 936 (8th Cir. 1983), as the source for the standard.  *Brodnicki*, 75 F.3d at 1265 (quoting *Henderson*).  But *Henderson* involved a challenge to an *in*-court identification; it therefore does not support extending the "irreparable misidentification" standard to out-of-court identifications.  *See Henderson*, 719 F.2d at 936 ("Due process challenges to convictions based on in-court identifications which follow a suggestive out-of-court confrontation are reviewed under a two-step test.").  Subsequent Eighth Circuit cases have cited *Brodnicki* and its progeny in applying the "irreparable misidentification" standard to evidence of out-of-court identifications.  *See, e.g.*, *United States v. King*, 148 F.3d

968, 970 (8th Cir. 1998); *see also United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006) (citing *King*).

This Court is thus in a difficult position.  On the one hand, the Supreme Court clearly directed that the "irreparable misidentification" standard that applies to in-court identifications should apply to out-of-court identifications "with the deletion of 'irreparable' . . . " *Biggers*, 409 U.S. at 198.  On the other hand, the Eighth Circuit has applied the "irreparable misidentification" standard to out-of-court identifications without the deletion of "irreparable."  Because the Eighth Circuit has never explained or even acknowledged the departure from *Biggers* (leaving open the possibility that the departure was inadvertent), and because the Eighth Circuit cannot overrule the Supreme Court, this Court respectfully follows *Biggers* rather than *Brodnicki*.[10]

Under *Biggers*, the suggestiveness of an identification procedure does not alone give rise to a due-process violation.  409 U.S. at 198-99.  Instead, the "central question" is whether, even if an out-of-court identification procedure was suggestive, the identification was reliable under all of the circumstances.  *Id.* at 199.  Accordingly, two questions must be answered to determine

---

[10]In *Manson v. Brathwaite*, the Supreme Court found that admitting evidence of an out-of-court identification based on a witness's viewing of a single photograph did not violate the defendant's due-process rights, summing up as follows:  "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'"  432 U.S. 98, 116 (1977) (quoting *Biggers*).

But *Manson* did not even acknowledge the fact that *Biggers* said that the word "irreparable" should be deleted from this standard when considering out-of-court identifications. *Biggers*, 409 U.S. at 198.  This Court therefore does not believe that *Manson* intended to overrule *Biggers* on this point.  Further, courts outside of the Eighth Circuit have, after *Manson*, continued to rely on the distinction in *Biggers* between the standards that apply to in-court and out-of-court identification testimony.  *See Rodriguez v. Young*, 906 F.2d 1153, 1162 (7th Cir. 1990); *Nassar v. Vinzant*, 519 F.2d 798, 801 n.2 (1st Cir. 1975); *United States v. Wilson*, 493 F. Supp. 2d 469, 471 (E.D.N.Y. 2006).

whether evidence of an out-of-court identification can be admitted at trial consistently with due process:  First, was the identification procedure unduly suggestive?  Second, even if the procedure was unduly suggestive, was the identification nevertheless reliable under the totality of the circumstances?  *See King*, 148 F.3d at 970.

### A.  Suggestiveness

As to the first question, although the show-up identification procedure challenged by Pickar was suggestive, it was not *unduly* suggestive under Eighth Circuit precedent.  The Eighth Circuit has been clear that, "[a]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations."  *Id.* (quotation omitted).  Further, "[n]ecessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive."  *Id.*

In this case, Pickar was handcuffed, standing between a uniformed police officer and a plainclothes officer, with one of the officers pointing a flashlight that cast an invisible beam at his face.  Doubtless the witnesses knew that the police considered Pickar a suspect — that is true with respect to just about any show-up — but that does not mean that the show-up was unduly suggestive.

Of controlling significance is *United States v. Martinez*, a bank-robbery case in which the Eighth Circuit held that a show-up procedure very similar to Pickar's was not unduly suggestive.  462 F.3d 903, 911 (8th Cir. 2006).  The defendant in *Martinez* was placed "on the sidewalk in front of the bank toward the windows, hands behind his back and cuffed."  *Id.* at 906.  The court rejected the defendant's contention that "because he was handcuffed, he had been driven to the

bank in a police car, and because police offers were present," the show-up procedure was unduly suggestive. *Id.* at 911.

The show-up procedures in both *Martinez* and this case differ from the procedure found to be unduly suggestive in *Clark v. Caspari*, 274 F.3d 507 (8th Cir. 2001), involving the robbery of a liquor store by two African-American men. In that case, the defendants, two African-American men, were "surrounded by white male police officers," and the witnesses observed one of the defendants, who had been lying face down on the ground while handcuffed, "being hauled to his feet." *Id.* at 509. Further, one of the police officers was holding a shotgun. *Id.* And although the witnesses had been told that they would be shown several suspects, they were in fact shown only two. *Id.* at 511. The court found these circumstances "coercive," noting that the witnesses "may have felt obligated to positively identify [the defendants], so as not to disagree with the police, whose actions exhibited their belief that they had apprehended the correct suspects." *Id.*

In both this case and *Martinez*, by contrast, the suspects were accompanied, but not surrounded, by police officers, and the police officers were not brandishing weapons. Further, in *Clark* the police manhandled the suspect in view of the witnesses. Although Pickar was supported in part by a police officer, there is no evidence that witnesses saw him being pulled up or pushed around. Finally, and most importantly, the witnesses in *Clark* were in direct proximity to both the suspects and the police surrounding them. *Clark*, 274 F.3d at 509. The witnesses in this case and in *Martinez*, however, viewed the suspect through a window. Such separation from the suspect and from the police officers accompanying him decreases the coerciveness of a show-

up procedure.  Accordingly, because the show-up in this case more closely resembles that in *Martinez* than that in *Clark*, the Court finds that it was not unduly suggestive.[11]

### B.  Reliability

Even if the show-up procedure in this case *was* unduly suggestive, the Court finds that under the totality of the circumstances, there was not a substantial likelihood of misidentification by four out of the five witnesses.  Specifically, the Court would not suppress the identification testimony of Bartsch, Blackwell, Comfort, or Forrey even if the show-up procedure had been unduly suggestive.  The Court would suppress Stoltenberg's identification testimony if the procedure had been unduly suggestive — but the Court need not do so in light of its finding, discussed above, that the show-up procedure was not unduly suggestive.

### 1.  Factors to Consider

Under *Biggers*, five factors must be considered in assessing the likelihood of misidentification resulting from an unduly suggestive out-of-court identification procedure: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention at that time; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when he identified the criminal; and (5) the length of time between the crime and the confrontation.  490 U.S. at 199-200.

Notably, the five factors to be considered under *Biggers* do not include the strength of the other evidence against the defendant, and the Court rejects the notion that such evidence is

---

[11]Evidence of a show-up procedure like those in this case and in *Martinez* was also found not to violate the defendant's due-process rights in *United States v. Jones*, 535 F.3d 886, 891-92 (8th Cir. 2008).  But *Jones* did not decide whether the show-up procedure was unduly suggestive. Instead, *Jones* simply held that "[b]ased on the totality of the circumstances, there is very little likelihood of misidentification by [the witnesses]."  *Id.* at 891 (citation omitted).

relevant.  The Court therefore respectfully disagrees with Judge Nelson's suggestion that courts should "consider the strength of other evidence against the defendant when making a reliability determination."  R&R at 15.  In the Court's opinion, such an approach confuses the question whether there has been a constitutional violation in the first place with the question whether, if there has been such a violation, it was nevertheless harmless.

The presence or absence of other evidence of a defendant's guilt has nothing to do with the reliability of the identification procedure *itself*.  If, for example, the police take a witness who barely saw a bank robber to a show-up procedure two years after the robbery and threaten to beat the witness unless she identifies the suspect as the robber, the show-up procedure would obviously be unduly suggestive, and there would obviously be a substantial likelihood of misidentification *by that witness*.  The likelihood of misidentification by the witness would not change just because the suspect had been captured on videotape and left his fingerprints at the scene.  Such evidence would not make the witness's identification any more reliable; it would merely suggest that, if the judge erred and admitted evidence about the show-up procedure, that error might be harmless.

Put another way, under *Biggers*, the likelihood of misidentification that matters for due-process purposes is not the likelihood that, based on all of the evidence in the case, the person identified by a witness did not in fact commit the crime of which he is accused.  Rather, the issue is whether, based on the totality of the circumstances surrounding the *identification procedure*, the result of *that procedure* — the identification testimony — is itself reliable.  An unreliable identification procedure does not become reliable because of other evidence of a defendant's

-20-

guilt, any more than an unreliable DNA test (or fingerprint test, or ballistics test) becomes reliable because of other evidence of a defendant's guilt.

The Court's conclusion on this point is entirely consistent with *Kennaugh v. Miller*, 289 F.3d 36 (2d Cir. 2002), which was cited by Judge Nelson. *Kennaugh* did not hold that identification testimony was rendered reliable by other evidence of the defendant's guilt. Instead, *Kennaugh,* a habeas case, held that even if the state trial court erroneously admitted certain identification testimony, the error was harmless in light of the other evidence of the defendant's guilt. Indeed, *Kennaugh* suggested that the identification testimony was improperly admitted, observing that "it is dubious whether the state court did anything at all to safeguard the due process protections stated in *Manson* [*v. Brathwaite,* 432 U.S. 98,(1977)]," a post-*Biggers* case about identification testimony. *Kennaugh*, 289 F.3d at 48. But *Kennaugh* continued: "[W]e need not examine that question further, for . . . any error the state court may have made here was harmless. The evidence of [the defendant's] guilt independent of [the challenged] identification was powerful." *Id.*

The Court also finds that *United States v. Rogers*, 73 F.3d 774 (8th Cir. 2001), does not support assessing the reliability of challenged identification testimony on the basis of evidence unrelated to the identification procedure. It is true that in rejecting on appeal a defendant's challenge to the admission of in-court identification testimony, after noting that two witnesses besides the witness whose testimony was challenged identified the defendant, *Rogers* then said, "[t]he additional testimony diminishes any likelihood of irreparable misidentification in this case." *Id.* at 778. But *Rogers* also emphasized that the defendant's attorney highlighted for the jury the various problems with the in-court identification that arguably rendered it unreliable. *Id.*

And the actual holding in *Rogers* was quite limited:  The Eighth Circuit held that although the challenged identification "may have been tainted, we cannot say that the procedures used in this case violated [the defendant's] due process rights."  *Id.*

Although *Rogers* is not entirely clear, the Court is persuaded that the result in *Rogers* reflects, in essence, an application of the harmless-error standard, and not an (unacknowledged) extension of *Biggers*.  The five factors enumerated in *Biggers* relate only to the reliability of the results of an identification procedure itself, and the Court believes that unrelated evidence of a defendant's guilt is not relevant to whether admission of challenged identification testimony violates a defendant's due-process rights.  *See* 490 U.S. at 199-200.  This conclusion is supported by *Manson v. v. Brathwaite,* in which, after discussing the *Biggers* factors in connection with a challenged identification, the Court said:  "Although it *plays no part in our analysis*, all this assurance as to the reliability of the identification [i.e., the *Biggers* analysis] is hardly undermined by" *other evidence* of the defendant's guilt.  432 U.S. 98, 116 (1977) (emphasis added).

2.  Reliability of Challenged Identification Testimony

Three of the witnesses in this case — Blackwell, Comfort, and Forrey — had a good opportunity to view the robber and paid fairly close attention to him when the crime took place. Blackwell interacted directly him during the robbery and was suspicious of him from the moment he first spoke to her.  Comfort looked him directly in the face twice, when he entered and left the bank, and she watched his back while he was at Blackwell's teller station.  And Forrey was standing right next to Blackwell when the robbery took place.  All three of these witnesses gave generally consistent descriptions of the robber's appearance, including his age, clothing, and

facial hair.  About forty-five minutes passed between the robbery and the show-up procedure, so their memories were fresh when they identified Pickar.  Finally, all three of these witnesses were very confident when they identified Pickar as the bank robber.

Bartsch's testimony is not as strong as the testimony of these first three witnesses, but the Court nonetheless finds it reliable in light of the five *Biggers* factors.  Bartsch admitted that he did not pay much attention to the robber when the robbery took place.  Bartsch did, however, notice that the robber had long hair, looked scruffy, and was wearing a Vikings jacket.  Bartsch came into the bank around the same time as the robber and stood next to him at the counter of the bank, and they were the bank's only two customers at the time.  Finally, Bartsch was shown Pickar less than an hour after the robbery, and Bartsch was very confident when he identified Pickar.

Stoltenberg's testimony, however, is even weaker than Bartsch's, and the Court does not find it to be reliable in light of the *Biggers* factors.  First, although Stoltenberg saw the robber walking across the parking lot, she did not see him inside the bank until the robbery was almost complete.  In her own words, Stoltenberg got a "quick glance" at him.  Gov't Ex. 2 Track 6 at 2:13.  Her description of him was consistent with the descriptions given by the other witnesses, but she was less confident when she identified Pickar during the show-up procedure.  Though Stoltenberg did say that she was sure that Pickar was the robber, immediately after saying so for the first time, she qualified her statement and expressed some hesitancy about whether Pickar *was* the person that she saw or merely *looked like* the person that she saw.  After Stoltenberg expressed this hesitation, Helmueller again asked her if she was sure that Pickar was the robber, and she responded, "Yes."  Although it is a close question, the Court does not think that

Stoltenberg's identification of Pickar was sufficiently reliable under *Biggers* to be admitted if the show-up procedure had been unduly suggestive.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court OVERRULES defendant Greg Allen Pickar's objection [Docket No. 64] and ADOPTS IN PART Judge Nelson's Report and Recommendation [Docket No. 59] to the extent that it is consistent with this Order.  Accordingly, IT IS HEREBY ORDERED THAT:

1.  Pickar's motion to suppress evidence from search and seizure [Docket No. 26] is DENIED.

2.  Pickar's motion to suppress statements [Docket No. 25] is DENIED IN PART as to his statement of his name and GRANTED IN PART as to all other challenged statements.

3.  Pickar's motion to suppress witness identifications [Docket No. 27] is DENIED.

Dated:  December 23, 2008                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge